NORTHERN ASSURANCE CO. v. MEYER.
SAME v. KRAENZLEIN.

1. EVIDENCE—BILLS AND NOTES—PAROL TESTIMONY—CONTRACTS.
   Valid notes, signed by defendants in payment of life insurance premiums, are controlling written evidence of what agreements were finally made between them and the insurance company.

2. INSURANCE—ANTI-REBATE LAW.
   The buying of drinks of intoxicating liquor for defendants whom he was soliciting, by the agent of a life insurance

company, where the defendants were sober and mentally
normal, cannot be classed as a distinction or discrimination
in favor of defendants within the purview and intent of
the anti-rebate law (Act No. 181, Pub. Acts 1907, 2 Comp.
Laws 1915, § 9353).

3. Same—Interest.

Neither does the failure to exact interest upon notes given
for premiums for the short time necessarily consumed in
the expeditious consummation of the transaction, according
to due course of mail and customary manner of doing
business, contravene the purpose or spirit of the law.

4. Same—Premium Notes—Payment.

The acceptance by an insurer of an insured's note for the
first premium will make the contract of insurance bind-
ing, even though the policy required the premium to be
paid before the contract should become effective.

5. Same—Premium Notes—Fraud—Estoppel—Rescission.

Where defendants gave notes for the first year's premiums
on life insurance policies, took possession of the policies
and receipts and retained them during the entire year,
and had the benefit of the insurance, they are estopped
from asserting that the notes were obtained by fraud, in
an action to recover thereon, where they took no active
steps to rescind, but allowed their claim to rest in parol.

Error to Bay; Sharpe, J., presiding. Submitted Oc-
tober 3, 1916. (Docket No. 14.) Decided December
22, 1916.

Assumpsit in justice's court by the Northern As-
surance Company against John George Meyer and Ru-
dolph Kraenzlein for the amount of premiums on cer-
tain policies of life insurance. From judgments for
plaintiff, defendants appealed to the circuit court
where both were tried as one suit. Judgment for plain-
tiff on a directed verdict. Defendants bring error.
Affirmed.

*Charles W. Hitchcock,* for appellants.

*Weadock & Duffy,* for appellee.

STEERE, J.   The above-entitled causes were apparently begun in justice's court, as the pleadings were oral, but heard together in the circuit court of Bay county and brought here upon a single record, with the explanation in the bill of exceptions that:

"The defendants were separately sued, but the cases involved one and the same question, and both suits were tried together," and "it was agreed on the trial that the evidence submitted should be applicable to both of these cases."

Plaintiff declared orally upon the common counts in assumpsit and especially upon two notes signed by defendants.  That signed by defendant Meyer is as follows:

"Bay City, Mich., July 16th, 1913.        $155.76.

"On delivery of policy after date for value received I promise to pay to the order of Northern Assurance Co., one hundred fifty-five and 76/100 dollars, at the Bay County Savings Bank, Bay City, Mich., with interest thereon at the rate of seven per cent. per annum after maturity.

"No........ Due on delivery of policy.

[Signed]   "JOHN GEORGE MEYER."

Indorsed on back:

"For collection.

"NORTHERN ASSURANCE CO.,
"C. L. AYERS, Prest."

The one bearing defendant Kraenzlein's signature is identical in form and date, the amount being for $158.46, owing to a difference in their ages and consequent cost of the policies for which it is claimed the notes were given.  The plea is stated as follows:

"The defendants respectively orally pleaded the general issue and gave notice under said plea that plaintiff was not the proper party to commence suit, that if plaintiff accepted a note that did not bear interest from the date of its execution, it was guilty of rebating under the law; that if Mr. Fitzgerald paid the note,

less his commission, the note was his; that there was a lack of consideration and the policy was void under the statute because it was not in force until the first premium was paid; that plaintiff's agent, Fitzgerald, made misrepresentations in securing said insurance."

At conclusion of the testimony the court directed a verdict in favor of plaintiff, and entered judgment, or judgments, thereon for the amount of the notes, with interest, according as they read.

Plaintiff is, and was in 1913, a Michigan corporation, with its headquarters and home office in the city of Detroit, duly authorized to engage in the business of selling life insurance in this State. It had in its employ a soliciting agent named Fitzgerald, who, residing in Bay City, worked that territory. He used an automobile in his business, and on the afternoon of July 16, 1913, drove out to a place of entertainment called the "Farmer's Home," owned by a man named Martin, located about nine miles southwest of Bay City, where defendants were at work putting down a cement floor in the basement of the saloon building. Defendants were workmen, contracting masons as stated by Kraenzlein, and both testified that they had been together for a number of years as contractors, bidding on jobs and taking contracts in their line around through the country, at times also doing work by the day. Fitzgerald solicited them for insurance, and secured from each an application for a $5,000 policy of life insurance. After securing their written applications Fitzgerald procured a medical examiner, who examined and passed them for insurance. A record of their medical examination was prepared, and the two notes in question for the amounts of the first year's premiums on their respective policies were signed by them. The applications were promptly forwarded to the home office by Fitzgerald, there approved, and the policies, dated July 16, 1913, with re-

ceipts for the first year's premiums, were issued and forwarded to Fitzgerald, who, on July 21, 1913, took them to defendants, who were working at another place, not far from where one or both of them resided, in Frankenlust township. The foregoing facts are undisputed. Defendants, however, contend that they did not knowingly sign the notes; that they declined to pay for or accept the policies when Fitzgerald tendered them, and repudiated the whole transaction when he claimed to have their notes.

Fitzgerald testified that after securing their applications for insurance he explained to them that by giving their notes for the first year's premiums, payable on delivery of the policies, he could give them a binding receipt, so that they would be insured from that time, provided their applications were accepted; that they assented to this proposition and signed the notes, receiving from him the binding receipts; that he made no other proposal or promise touching time or terms of payment, and when he delivered the policies to them, there was no refusal or demurrer in regard to taking them, nor denial of their notes, but they told him they did not have the money collected yet, or on hand, Meyer saying he would leave the money at his brother's hotel later, and Kraenzlein said he did not want to draw money from the bank and pay interest; that witness thereupon said it was all right, as the notes were bearing interest, and went away, leaving the policies and receipts for premiums with them.

Defendants testified that their applications were made on assurances by Fitzgerald that they should have a year, without interest, to pay the first premiums; that they did not understandingly sign the notes, their signatures to which are not denied; and that when the policies were offered to them on July 21st they told Fitzgerald they did not have the money

and could not pay them, in reply to which he insisted on their accepting the policies, said he had their notes and requested payment; that they then each denied signing a note, accused him of deceiving them, declined to accept the policies, and offered them back to him, but he refused, telling them they had their policies and he had their notes, which they would have to pay, and went away. Each, however, took and kept his policy and receipt for premium until produced at the trial; counsel for plaintiff having requested their production.

Attached to the policies were copies of their applications, with "supplementary statement" as to residence, occupation, relatives, health, habits, etc., which they admittedly signed, and with them a receipt for the first year's premium. Kraenzlein's is as follows:

"Received from Rudolph Kraenzlein of Bay City, Michigan, the sum of one hundred fifty-eight and 46/100 dollars, being the annual premium on policy No. ——— for $5,000 due on the 16th day of July, 1913, which pays the regular premium up to the 16th day of July, 1914.

"This receipt to be valid must be signed by the president or secretary, and countersigned by an authorized agent of the company.

"C. L. AYRES, President.

"Countersigned this 21st day of July, 1913.

"JAMES E. FITZGERALD, Agent."

That of Meyer is the same, excepting name and amount. Kraenzlein testified that the receipt was inside his policy, which he took home and read. Asked, "From that time to this you have had it?" he answered, "Yes."

The questions raised and argued under defendants' assignments of error are, in brief, that plaintiff by the undisputed evidence was guilty of rebating under Act No. 181, Pub. Acts 1907 (2 Comp. Laws 1915, § 9353), and a verdict should have been directed for

that reason; that, irrespective of the question of re-
bate, whether a binding receipt was given defendants
when they made application, and whether they were
deceived and fraudulently misled into signing these
papers, particularly the notes in question, were con-
trolling issues of facts which should have been sub-
mitted to the jury. The so-called "anti-rebate law"
provides in part:

"Nor shall any such company or agent thereof make
any contract of insurance or agreement as to such
contract other than is plainly expressed in the policy
issued thereon; nor shall any such company, or any
officer, agent, solicitor or representative thereof, pay,
allow or give, or offer to pay, allow or give, directly
or indirectly, as inducement to insurance, any rebate
of premium," etc.

The particulars in which it is claimed this law was
violated are that inducements were held out to de-
fendants by Fitzgerald buying the drinks, offering
them a year in which to pay without interest, and
taking their notes without interest until the policies
were delivered. If the notes signed by defendants are
valid, they not only sustain Fitzgerald's testimony that
no proposal was made during negotiations for a year's
time in which to pay, but are the controlling written
evidence of what agreement was finally made. It is
undisputed that Fitzgerald treated defendants and oth-
ers working in the basement of the saloon, and bought
drinks for defendants during, or after, the negotiations
for insurance. Kraenzlein, who testified to drinking
several times, said:

"We did not have any drinks while Fitzgerald was
taking the application. * * * He bought a few
drinks before we went out."

Both defendants testified that they drank occasion-
ally and were familiar with barrooms. Kraenzlein had
tended bar in a hotel at one time, and Meyer admitted

a reasonable familiarity with such places, in the capacity of patron. They testified that they were not under the influence of liquor, but were in full possession of their faculties, returning to their work when the business was finished; Meyer suggesting, however, that as a result of the drinks "a fellow would be liable to be a little easy." While this crude and decadent method of lubricating solicitation of business is to be deprecated, it cannot be classed as a distinction, or discrimination, in favor of defendants within the purview and intent of the anti-rebate law, where the parties solicited are sober, and mentally normal; neither does the failure to exact interest upon these notes for the short time necessarily consumed in the expeditious consummation of the transaction, according to due course of mail and customary manner of doing business, contravene the purpose or spirit of this law. Under plaintiff's undisputed testimony, the premiums sought to be recovered as evidenced by the notes are the exact rates charged to others of like ages for policies of the same kind and amount; the agent was authorized to take notes for premiums; the papers were promptly forwarded to the home office, approved, notes accepted in payment, policies and receipts in full for the premiums were prepared, sent to Bay City by mail, and delivered to defendants within five days. In *Heffron* v. *Daly*, 133 Mich. 613 (95 N. W. 714), cited by defendant, there was a division of commission with the insured, and his note given for the balance. As evidenced by the note and a written agreement between the parties, the transaction from its inception clearly showed a marked discrimination against the letter and spirit of the law.

The giving and accepting a note is a payment in advance in compliance with the statute. *Sebring* v. *Hazard*, 128 Mich. 330 (87 N. W. 257).

"In general, the acceptance by an insurer of an insured's note for first premium will make the contract of insurance binding, even though the policy requires the premium to be paid before the contract shall become effective." 1 Cooley's Briefs on Insurance, p. 486.

Of their admitted signatures to the notes, which defendants claim to have been misled by Fitzgerald into inadvertently signing, they testify that after they signed their applications in the back room of the saloon above where they were working, Fitzgerald shoved a slip or piece of paper over to each of them at the table where they were sitting, and requested their signatures. Kraenzlein testified he asked Fitzgerald what it was and—

"he said, 'It is only a certificate'; and I signed it, and that was all there was to it.   *   *   *   I simply took the man's word for it."

Meyer testified:

"He shoved me over a slip of paper while he was sitting at the table. I asked him what it was. He said that is nothing; 'I just want your signature.' So I signed that and that is all there was to it."

Defendants were mature men of at least average intelligence and business experience. They were mechanics who had been working for themselves in partnership as contracting masons for several years, making and performing independent contracts in the line of their calling, necessarily requiring independent thought and action. They had been to school, and were not ignorant or illiterate. The trial court said of them:

"They both could read and write, and from their appearance on the stand were young men of more than ordinary intelligence."

They knew this was a business transaction of some importance; that the essentials were reduced to writ-

ing and no fiduciary relations existed between them and Fitzgerald. This is not of that class of cases where the parties claiming to have been deceived are shown to be inexperienced in the business world, illiterate or mentally deficient, or dealing with one in whom by reason of their relations they had reason to repose confidence, or even the misreading of an instrument to them. These notes placed before them upon the table at which they sat were short, plain, and unambiguous. An examination of the original record in the case of *Price* v. *Marthen*, 122 Mich. 655 (81 N. W. 551), shows in many material respects a marked analogy between the claims made here and those urged by defendant there. In holding the defense could not be sustained in that case the court said of the contract under consideration, which it was claimed defendant had been tricked into signing by misrepresenting its contents:

"The defendant had ample opportunity to read it. It was his own folly if he chose not to do so. It was not a long one. He knew that it was to be sent by the agent to the plaintiff, to be acted upon by them. It contained definite terms of payment, and provided for an absolute sale. It was unambiguous."

"Before plaintiff is entitled to relief based upon fraudulent representations of the defendant, he must have exercised ordinary prudence and discretion in reference to faith in the representations made. In other words, if the representations relate to a subject-matter which is within his power to investigate for himself by the exercise of reasonable care and prudence, he must do so.

"Where it appears that an instrument is signed without reading, or hearing it read, and with all the means of knowing the truth in his power, and a blind confidence is reposed in the representations of another which are not calculated to deceive a man of ordinary prudence and circumspection, it is not fraud." Smith on Frauds, §§ 75, 78.

But whatever the truth may be in regard to those

matters, it appears undisputed from their own testimony that, after knowing plaintiff had accepted their applications, held their notes in payment for the first year's premium, issued to them their policies according to the terms of their applications and sent receipts for the premiums, they took possession of these policies and receipts and retained them during the entire year they were in force, and had the benefit of the insurance. The receipts they held so advised them, and the last statement in their applications just above their signatures, copies of which they held attached to the policies, read, in Kraenzlein's case:

"I have paid to the subscribing agent $158.46 on delivery of policy and hold binding receipt No. 8121, showing such payment."

And in Meyer's case the same, except the amount stated paid was $155.76 and number of binding receipt, 8122. Although they claim to have protested and refused payment to Fitzgerald on the ground that they did not knowingly sign the note, they stood on their refusal, took no active steps to rescind, left their claim resting in parol, retained the written policies and receipts in their possession with full knowledge of all the facts, true or claimed, and in a position where they, or their beneficiaries, could enforce payment of the policies should loss occur. By so doing they have estopped themselves from asserting that the notes they signed, and which they knew plaintiff accepted and receipted for in payment of the premiums, were obtained by fraudulent representations of the soliciting agent.

"The insured cannot defeat payment of the premium upon a policy of insurance, issued at his instance, while he still retains the contract, the very issuance and delivery of which depend upon a cross-obligation that the premiums will be paid." *Boykin* v. *Insurance Co.,* 14 Ga. App. 666 (82 S. E. 60).

The judgment is affirmed.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred. PERSON, J., did not sit.