LAWYERS TITLE INSURANCE CORPORATION v CHICAGO TITLE
INSURANCE COMPANY

Docket No. 89019. Submitted April 13, 1987, at Detroit. Decided July
6, 1987.

Prior to 1974, real estate brokers and agents who referred their
clients to a title insurance company often received a commis-
sion from that title insurance company. In 1974, the United
States Congress passed the Real Estate Settlement Procedures
Act, which prohibited real estate agents and brokers from
receiving referral fees when a federally related mortgage was
involved. To avoid violating RESPA directly, some real estate
brokers organized their own title insurance companies to which
they referred their real estate customers. As shareholders in
these title insurance companies, the real estate brokers re-
ceived dividends based on the title insurance company's profits
which were derived from their referrals. In the mid-1970s,
Lawyers Title Insurance Corporation recognized that title in-
surance agencies with real estate brokers as owners would have
"guaranteed" title insurance business from their respective real
estate agencies. Lawyers Title then entered into an agreement
with the other respondents, Wayne-Oakland Title Agency, Inc.,
Lincoln Agency Company, and Interstate Title, Inc., whereby
those respondents became the exclusive agents of Lawyers
Title. Lawyers Title did title searches and issued insurance
policies for the other respondents; in turn, they earned profits
and paid substantial dividends to their shareholder-real estate
brokers. On December 16, 1979, the Insurance Commissioner
issued a notice advising Lawyers Title, Wayne-Oakland, Lin-
coln, and Interstate that hearings were to be held to determine
whether their actions violated state antitrust, unfair competi-
tion and insurance laws as well as federal real estate laws.
Chicago Title Insurance Company, Transamerica Title Insur-

REFERENCES

Am Jur 2d, Administrative Law §§ 92 *et seq.*, 162 *et seq.*
Am Jur 2d, Constitutional Law §§ 735 *et seq.*
Am Jur 2d, Insurance § 108 *et seq.*
Public regulation or control of insurance agents or brokers. 10
ALR2d 950.

ance, and Commonwealth Title Insurance intervened in the hearings before the Insurance Commissioner. Following extensive briefs by all the parties involved, the hearing officer issued a proposed decision, concluding that respondents violated MCL 500.1208, 500.2017 and 500.2066; MSA 24.11208, 24.12017 and 24.12066, but not MCL 500.1242(3), 500.1243 and 500.2012; MSA 24.11242(3), 24.11243 and 24.12012 and not Insurance Bureau Rule 500.4. The Insurance Commissioner reversed the hearing officer's decision only insofar as he concluded that respondents had violated MCL 500.2066; MSA 24.12066. Moreover, the Insurance Commissioner concluded that respondents, other than Lawyers Title, violated MCL 500.1207(3); MSA 24.11207(3). The commissioner fined Wayne-Oakland, Lincoln and Interstate $100 for violating MCL 500.1207(3); MSA 24.11207(3) and $500 for violating MCL 500.2017; MSA 24.12017. The commissioner also fined Lawyers Title $1,000 for violating MCL 500.2017; MSA 24.12017 under two different counts of the complaint. Finally, the commissioner issued a cease-and-desist order requiring the real estate brokers, who were also shareholders in Wayne-Oakland, Lincoln and Interstate, to divest themselves of their interest in these agencies. Respondents appealed to the Oakland Circuit Court, claiming that they had not violated MCL 500.2107; MSA 24.12017 and that the proceedings below were unfairly instituted and conducted. Wayne-Oakland, Lincoln and Interstate also appealed the commissioner's finding that they had violated MCL 500.1207(3); MSA 24.11207(3). Intervenors cross-appealed, claiming that the commissioner should have found that respondents also violated other provisions of the state Insurance Code as well as state antitrust and federal real estate laws. The circuit court, John H. O'Brien, J., affirmed the commissioner's opinion and order. Respondents appealed and the intervenors cross-appealed, challenging the commissioner's interpretation of MCL 500.1207(3) and 500.2017; MSA 24.11207(3) and 24.12017 and her application of those statutes to the facts.

The Court of Appeals held:

1. The commissioner erred in finding that respondents violated MCL 500.2017; MSA 24.12017. That section precludes the giving of "inducements to insurance" which means inducement to the insured to purchase insurance.

2. The commissioner's holding does not ban all closely held title corporations whose shareholders would naturally refer their associates to the corporation and, in turn, receive dividends. The commissioner only required owner-shareholder-brokers to divest themselves of their interest in the respondent

corporations. Her holding did not apply to nonbroker share-holders of respondents.

3. The finding of the commissioner that respondents violated MCL 500.1207(3); MSA 24.11207(3) was proper and was not inconsistent with her holding that they did not violate the Real Estate Settlement Procedures Act, since that federal law is not dispositive of how the Court of Appeals should interpret the Michigan statute.

4. The commissioner's decision to proceed by initiating a contested case was not improper.

5. The commissioner did not abuse her discretion in applying MCL 500.1207(3); MSA 24.11207(3) to Wayne-Oakland, Lincoln and Interstate.

6. The commissioner's decision to charge respondents with violating the insurance laws was not based upon a suspect classification and was not a decision to prosecute respondents to the exclusion of others engaged in the same conduct.

7. The commissioner did not err in finding that respondents had not violated MCL 500.2066(1); MSA 24.13066(1), which is directed to conduct between sellers and purchasers of insurance.

8. The commissioner did not err in holding that the respondents did not violate MCL 500.1208; MSA 24.11208 when they insured their owner-shareholder-brokers' real estate clients.

9. The commissioner did not err in holding that she had no jurisdiction to consider respondents' alleged violations of the Real Estate Settlement Procedures Act and state antitrust laws in determining whether respondents' licenses should be revoked.

10. The commissioner's finding that respondents had not violated MCL 500.2012; MSA 24.12012 was supported by competent, material and substantial evidence.

Affirmed in part and reversed in part.

1. INSURANCE — INDUCEMENT TO INSURANCE — JUDICIAL CONSTRUCTION.

The phrase "inducement to insurance" in the statute prohibiting insurers and insurance agents from giving or offering to give an inducement to insurance means an inducement to the insured to purchase insurance (MCL 500.2066[1]; MSA 24.12066[1]).

2. ADMINISTRATIVE LAW — RULE-MAKING.

An administrative agency may announce a new rule by way of a contested hearing or adjudicative proceeding rather than a rule-making proceeding.

3. Courts — Judicial Decisions — Retroactivity.

As a general rule, a judicial decision is given retroactive effect; where a judicial interpretation changes settled law, our courts favor a rule of limited retroactivity, applying the new rule to the case before it and to pending and future cases; a decision may be applied prospectively only when a newly-announced rule would have a harsh effect because of reliance upon the old rule.

4. Constitutional Law — Equal Protection — Selection of Laws — Enforcement of Laws — Arbitrary Classification.

Selectivity in the enforcement of laws is not a violation of the federal constitution as to equal protection unless the selection is based upon race, religion or some other arbitrary classification.

5. Insurance — Business Associates — Judicial Construction.

A statute prevents an insurance agent from using his license to obtain for himself or his business associates a preference in the premium rate because he receives benefits on the policies written; "business associates" should be read to include the same type of relationship as between the agent and his employer or employee (MCL 500.1208; MSA 24.11208).

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Donald S. Young, Kathleen McCree Lewis, Robert H. Gorlin, Jeffrey M. Lipshaw* and *Michael R. McCarthy*), for Lawyers Title Insurance Company, Wayne-Oakland Title Agency, Inc., Lincoln Title Agency Company and Interstate Title, Inc.

*Honigman, Miller, Schwartz & Cohn* (by *James K. Robinson* and *David A. Ettinger*), and *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Timothy H. Howlett*), for Intervenors Chicago Title Insurance Company, Transamerica Title Insurance Company and Commonwealth Land Title Insurance Company.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Harry G. Iwasko, Jr.,* and *Philip J. Smith,* Assistant Attorneys Gen-

eral, for the Department of Insurance and the Commissioner of Insurance.

Before: J. H. GILLIS, P.J., and BEASLEY and SAWYER, JJ.

PER CURIAM. Respondents appeal as of right the trial court's order affirming the Insurance Commissioner's order. Intervenors-cross-appellants cross-appeal. We affirm in part and reverse in part.

On December 16, 1979, the Insurance Commissioner issued a notice advising Lawyers Title Insurance Corporation and its affiliates, Wayne-Oakland Title Agency, Lincoln Title Agency Company, and Interstate Title, Incoporated, that hearings were to be held to determine whether their actions violated state antitrust, unfair competition and insurance laws as well as federal real estate laws. Chicago Title Insurance Company, Transamerica Title Insurance Company, and Commonwealth Land Title Insurance Company intervened in the hearings before the Insurance Commissioner; therefore, these agencies shall be referred to as intervenors.

The hearings began on February 9, 1981, and ended on July 9, 1982. Following extensive briefs by all the parties involved, the hearing officer issued a 110-page proposed decision, concluding that respondents violated MCL 500.1208, 500.2017 and 500.2066; MSA 24.11208, 24.12017 and 24.12066, but not MCL 500.1242(3), 500.1243 and 500.2012; MSA 24.11242(3), 24.11243 and 24.12012 and not Insurance Bureau Rule 500.4. The parties filed objections to these proposed findings of fact and the commissioner along with the hearing officer heard oral arguments. On March 19, 1984, the Insurance Commissioner issued her final opinion

and order. Therein, she reversed the hearing officer's decision only insofar as he concluded that respondents had violated MCL 500.2066; MSA 24.12066. Moreover, the Insurance Commissioner concluded that respondents, other than Lawyers Title, violated MCL 500.1207(3); MSA 24.11207(3). The commissioner fined Wayne-Oakland, Lincoln and Interstate $100 for violating MCL 500.1207(3); MSA 24.11207(3) and $500 for violating MCL 500.2017; MSA 24.12017. The commissioner also fined Lawyers Title $1,000 for violating MCL 500.2017; MSA 24.12017 under two different counts of the complaint. Finally, the commissioner issued a cease-and-desist order requiring the real estate brokers, who were also shareholders in Wayne-Oakland, Lincoln and Interstate, to divest themselves of their interest in these agencies.

Respondents appealed to the circuit court, claiming that they had not violated MCL 500.2017; MSA 24.12017 and that the proceedings below were unfairly instituted and conducted. Wayne-Oakland, Lincoln and Interstate also appealed the commissioner's finding that they had violated MCL 500.1207(3); MSA 24.11207(3). Intervenors cross-appealed, claiming that the commissioner should have found that respondents also violated other provisions of the state Insurance Code as well as state antitrust and federal real estate laws. The circuit court affirmed the commissioner's opinion and order.

As noted above, respondents now appeal and intervenors cross-appeal to this Court. We note that the parties do not dispute the commissioner's factual findings; instead, they challenge the commissioner's interpretations of MCL 500.1207(3) and 500.2017; MSA 24.11207(3) and 24.12017 and her application of those statutes to the facts in this case.

Before reaching the merits of the parties' claims, a brief factual explanation is required. Before 1974, real estate brokers and agents who referred their clients to a title insurance company often received a commission from that title insurance company. In 1974, the United States Congress passed the Real Estate Settlement Procedures Act (RESPA), 12 USC 2601 *et seq.*, which prohibited real estate agents and brokers from receiving referral fees when a federally-related mortgage was involved. To avoid violating RESPA directly, some real estate brokers organized their own title insurance companies to which they referred their real estate customers. As shareholders in these title insurance companies, the real estate brokers received dividends based on the title insurance company's profits which were derived from their referrals. For example, in this case, Wayne-Oakland's, Interstate's and Lincoln's shareholder-real estate brokers divided their respective company's stock in proportion to the amount of referral business expected to be generated by each shareholder-real estate broker.

In the mid-1970s, Lawyers Title recognized that title insurance agencies with real estate brokers as owners would have "guaranteed" title insurance business from their respective real estate agencies. Lawyers Title then entered into an agreement with the other respondents whereby those respondents became the exclusive agents of Lawyers Title. Lawyers Title did title searches and issued insurance policies for the other respondents; in turn, they earned profits and paid substantial dividends to their shareholder-real estate brokers. We note that the commissioner found that only two of the other respondents' owners were not real estate brokers.

We now turn to the applicable standards of

review in this case. The decision of an administrative agency should be affirmed if it is supported by competent, material, and substantial evidence and is not contrary to law. Const 1963, art 6, § 28. See also *Farmers State Bank of Concord v Dep't of Commerce, Financial Institutions Bureau,* 77 Mich App 313, 322-324; 258 NW2d 496 (1977), lv den 402 Mich 864 (1978). We also give great weight to the Insurance Commissioner's interpretation of a statute which she is charged with enforcing. *Michigan Life Ins Co v Comm'r of Ins,* 120 Mich App 552, 558; 328 NW2d 82 (1982), lv den 417 Mich 1077 (1983). Finally, our Court has often recognized that the insurance industry is of great public interest and that, therefore, insurance laws are to be liberally construed to favor the interests of the public. *Id.*

We now address the parties' claims. Lawyers Title claims that the Insurance Commissioner erred when she concluded that it violated MCL 500.2017; MSA 24.12017, which provides:

> The following are defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:
>
> Issuing or delivering or permitting agents, officers, or employees to issue or deliver, agency company stock or other capital stock, or benefit certificates or shares in any common law corporation, or securities or any special or advisory board contracts or other contracts of any kind promising returns and profits as an inducement to insurance.

The Insurance Commissioner held that Lawyers Title violated this section twice. First, Lawyers Title violated this section when it executed exclusive agency contracts with the other respondents and, second, when it "permitted" the other respondents to issue stock to the shareholder-brokers.

The Insurance Commissioner also found that the other respondents violated this section when they paid dividends to their shareholders.

The parties in this case differ over the application of the phrase "inducement to insurance." Respondents claim that inducement to insurance means inducement to purchase insurance (i.e., inducement to the insured). The intervenors and the Insurance Commissioner argue that inducement to insurance can be read more broadly. Each party relies on MCL 500.2066(1); MSA 24.12066(1) to support its interpretation. That section provides:

> No insurer, by itself or any other party, and no insurance agent or solicitor, personally or by any other party, transacting any kind of insurance business shall offer, promise, allow, give, set off or pay, directly or indirectly, any rebate of, or part of, the premium payable on the policy or on any policy, or agent's commission thereon, or earnings, profit, dividends or other benefit founded, arising, accruing or to accrue thereon, or therefrom, or any other valuable consideration or inducement to or for insurance, on any risk in this state now or hereafter to be written, which is not specified in the contract of insurance; nor shall any such insurer, agent or solicitor, personally or otherwise, offer, promise, give, sell, or purchase any stocks, bonds, securities or any dividend or profits accruing or to accrue thereof, or other thing of value whatsoever as inducement to insurance or in connection therewith which is not specified in the policy contract.

The Insurance Commissioner held that the respondents in this case did not violate § 2066(1) because that section prohibits actions by insurers to induce an insurance purchaser (i.e., an insured) to purchase a policy. The commissioner and the intervenors argue on appeal that § 2017 and § 2066 can

be interpreted differently because the penalties for violating each section differ. Compare MCL 500.2038; MSA 24.12038 with MCL 500.2066(2)-(3) and 500.2069; MSA 24.12066(2)-(3) and 24.12069. Moreover, while § 2066(1) refers to inducements to insurance "not specified in the policy contract," the commissioner and the intervenors ·note that § 2017 contains no such language. This is important because the policy contract is executed between the insured and the insurer. While the distinctions made by the commissioner and intervenors are apparent from a comparison of these statutes, we find that inducement to insurance, an ambiguous phrase, must be construed to effect the Legislature's intent. *Hinton v Parole Bd,* 148 Mich App 235, 239-240; 383 NW2d 626 (1986). We conclude that the phrase inducement to insurance in § 2017 should be read consistently with the similar phrases in MCL 500.2024 and 500.2066; MSA 24.12024 and 24.12066. *Natsch v City of Southfield,* 154 Mich App 317, 321-322; 397 NW2d 294 (1986), lv pending; *Todd v Textron, Inc,* 140 Mich App 412, 420-421; 364 NW2d 718 (1985), lv den 423 Mich 852 (1985). Construing the statutory scheme as a whole, we can only conclude that inducement to insurance means inducement to the insured to purchase insurance. *Id.* MCL 500.2017-500.2025 and 500.2066; MSA 24.12017-24.12025 and 24.12066. Hence, we accept respondents' position that they did not violate § 2017 because they did not offer insureds stock or other contracts promising a return or profit as an inducement to purchase insurance. Consequently, we reverse the commissioner's order that respondents violated § 2017 as well as the fines imposed for those violations. *Farmers State Bank of Concord, supra.* We decline to reach the parties' other arguments on this issue.

The other respondents also argue that the Insurance Commissioner erred when she found that they violated MCL 500.1207(3); MSA 24.11207(3), which provides:

> Except as provided in sections 1212 and 1860 and subsection (4), an agent shall not reward or remunerate any person for procuring or inducing business in this state, furnishing leads or prospects, or acting in any other manner as an agent.

The commissioner held that the other respondents violated § 1207(3) when they paid dividends to their shareholder-owner-brokers based upon the number of shares owned by each broker. It must be remembered that the stock was originally distributed to reflect the amount of business each broker would refer.

The other respondents claim that the commissioner's holding would effectively ban all closely held title corporations whose shareholders would naturally refer their associates to their corporation and, in turn, receive dividends. We disagree. In this case, Lawyers Title executed an exclusive agency agreement with the other respondents. The respondents were organized to reward or remunerate the other respondents' shareholder-owner-brokers as nearly as possible for their expected referrals. This factual situation is obviously unique and the commissioner clearly did not intend her holding to apply to all closely held corporations because she only required the owner-shareholder-brokers to divest themselves of their interest in the respondent corporations. Her holding did not apply to nonbroker shareholders of respondents.

The other respondents also claim that § 1207(3) was only intended to apply to monetary rewards for referrals to persons who are not licensed insur-

ance agents and not to forbid distribution of bona fide corporate dividends. Respondents fail to point out that the corporate dividends which they characterize as bona fide were also found by the commissioner to be a reward or remuneration for their shareholder-brokers to procure business. We further agree with the commissioner that the fact that the brokers might not receive dividends in direct proportion to their referrals is irrelevant under § 1207(3). The important facts are that the brokers were receiving dividends from respondents for procuring title insurance business and that they were receiving these dividends for the amount of title insurance business they were expected to refer.

Finally, the other respondents claim the commissioner's holding that they violated § 1207(3) is inconsistent with her holding that they did not violate RESPA. We find that RESPA, a federal law enacted after § 1207(3), is not dispositive on the issue of how this Court should interpret § 1207(3), absent preemption. Respondents do not argue that RESPA preempted § 1207(3). We agree with the commissioner's findings that Wayne-Oakland, Lincoln, and Interstate violated § 1207(3) and we uphold the $100 fines imposed.

Respondents next claim that the Insurance Commissioner announced a new rule by applying § 1207(3) to their activities and, therefore, the commissioner should have proceeded by rule-making rather than by initiating a contested case. Respondents claim that the practice of having broker-owned title companies was commonplace. This statement of the commissioner's findings is misleading. What the commissioner did find is that, prior to the enactment of RESPA in 1974, many real estate brokers were able to benefit from the referral of title insurance business by negotiat-

ing the payment of a commission or "kickback" for each referral. After RESPA became law, real estate brokers sought alternative means of benefitting from real estate referrals which they controlled. Many of the brokers, including respondents and intervenors, set up their own title agencies so that they could continue to profit from their referrals by sending their customers to their own agencies once direct kickbacks had been forbidden. None of the respondent agencies started doing business prior to 1975.

It appears that in 1975, attorneys for the intervenors brought their doubts concerning the legality of the practices of respondents to the attention of the Insurance Bureau. The bureau, with the assistance of intervenors' attorneys, formulated a questionnaire which was circulated to title insurance agencies. The results of the survey were analyzed and a report was issued by the bureau in 1976 entitled Real Estate Broker Ownership of Title Insurance Agencies: Consumer-Protection Imperatives. This report was highly critical of broker ownership of title agencies.

This report led to the issuance on June 3, 1977, by Insurance Commissioner Thomas Jones, of an interpretive guideline, Bulletin 77-2. The bulletin was addressed to all title insurers and title agents licensed to do business in Michigan, and it concluded that broker ownership of title insurance agencies violated various provisions of Michigan law:

> Among the statutes and regulations relevant to this inquiry are those which prohibit indirect rebating and restrict controlled business, those which require a licensed agent to be actively involved in the solicitation of business, and those which prohibit unfair methods of competition and unlawful restraints of trade. MCL 500.1204(3)[,]

500.1205(1)[,]   500.1207(3)   and   (5)[,]   500.1208[,]
500.1242(1), (2) and (3)[,] 500.2001 [*et seq.,*]
500.2066 [MSA 24.11204(3), 24.11205(1), 24.11207(3)
and (5), 24.11208, 24.11242(1), (2) and (3), 24.12001
*et seq.,* 24.12066], and R 500.4 (formerly, R 501.4)
of the Michigan Administrative Code. The forma-
tion and operation of a title insurance agency
controlled by real estate brokers to accommodate
the placement of their own business is not compat-
ible with all of these standards.

The bulletin also spelled out the bureau's future
course of action toward such agencies:

> No partnership or corporation shall qualify for
> licensure as a title insurance agent if such part-
> nership or corporation is owned or controlled,
> directly or indirectly, by one or more real estate
> brokers (herein, controlling real estate brokers)
> licensed under the provisions of 1919 PA 306, as
> amended, MCL 451.201 [*et seq.;* MSA 19.791 *et
> seq.*], and it reasonably appears that a primary
> purpose of such partnership or corporation, if a
> license is granted, will be to issue title insurance
> policies or commitments with respect to real prop-
> erty purchased or sold by persons represented by
> one or more of such controlling real estate brokers
> or their employees.
>
> These guidelines for determining qualification
> for initial licensure shall also be used to determine
> whether presently licensed title insurance agents
> and title insurers have violated Chapters 12 and
> 20 of the Insurance Code of 1956, as amended, and
> are thus subject to proceedings pursuant to those
> chapters.

While respondents point out that the bulletin did
not have the force of law because it was not issued
pursuant to public hearings or comment, it cer-
tainly put respondents on notice as to the bureau's
position regarding respondents' practices. Lawyers

Title cautiously acknowledged the impact of the bulletin by not entering into any insurance contracts with broker-owned agencies after its issuance.

The Insurance Commissioner instituted proceedings against respondents on December 6, 1979. Contrary to respondents' allegations, we find that the commissioner's interpretation of § 1207(3) did not announce a new rule. Moreover, even if it had, we find that the commissioner's decision to proceed by way of a contested hearing or adjudicative proceeding rather than a rule-making proceeding was not an abuse of discretion. See *National Labor Relations Bd v Bell Aerospace Co, Div of Textron, Inc,* 416 US 267; 94 S Ct 1757; 40 L Ed 2d 134 (1974); *American Way Life Ins Co v Comm'r of Ins,* 131 Mich App 1; 345 NW2d 634 (1983), lv den 419 Mich 937 (1984); *Michigan Life Ins Co v Comm'r of Ins,* 120 Mich App 552; 328 NW2d 82 (1982), lv den 417 Mich 1077 (1983).

Respondents also claim that the commissioner's interpretation of § 1207(3) should be given prospective effect only. As a general rule, a judicial decision is given retroactive effect. *Tebo v Havlik,* 418 Mich 350, 360; 343 NW2d 181 (1984), reh den 419 Mich 1201 (1984). Where a judicial interpretation changes settled law, our courts favor a rule of limited retroactivity, applying the new rule to the case before it and to pending and future cases. *Id.* Finally, a decision may be applied prospectively only when a newly-announced rule would have a harsh effect because of reliance upon the old rule. *Moorhouse v Ambassador Ins Co, Inc,* 147 Mich App 412, 421-422; 383 NW2d 219 (1985), lv den 425 Mich 856 (1986). We believe similar rules should apply to the quasi-judicial process of a contested hearing. Given the facts of this case, discussed above, we cannot say that the commissioner

abused her discretion when she applied § 1207(3) to Wayne-Oakland, Lincoln and Interstate.

Respondents also claim that the Insurance Commissioner discriminated against them when she chose to bring proceedings against them but not against others, including intervenors, engaged in similar conduct. Having reviewed the record, we find that the decision to charge respondents with violating the insurance laws was not based upon a suspect classification and was not a decision by the commissioner to prosecute respondents to the exclusion of others engaged in the same conduct. *Michigan Life Ins Co, supra,* p 563; *Oakland Co Prosecutor v 46th District Judge,* 76 Mich App 318, 330-331; 256 NW2d 776 (1977). Instead, the commissioner's decision was based upon the Insurance Bureau's conclusion that, given its limited resources, it should prosecute the agencies (respondents) which controlled the most business in the Detroit metropolitan area, where the problem of broker controlled agencies was the greatest.

We now turn to intervenor-cross-appellants' arguments on appeal. Intervenors first argue that the commissioner erred when she reversed the hearing officer's finding that respondents had violated MCL 500.2066(1); MSA 24.12066(1), which provides:

*No insurer,* by itself or any other party, *and no insurance agent* or solicitor, personally or by any other party, *transacting any kind of insurance* business *shall offer, promise, allow, give,* set off or pay, *directly or indirectly, any rebate of, or part of, the premium payable on the policy* or on any policy, *or agent's commission thereon, or earnings, profit,* dividends or other benefit founded, *arising, accruing or to accrue thereon,* or therefrom, or any other valuable consideration *or inducement to or for insurance,* on any risk in this state now or

> hereafter to be written, *which is not specified in the contract of insurance; nor shall any such insurer, agent* or solicitor, *personally or otherwise, offer, promise, give, sell, or purchase any stocks,* bonds, securities or any dividend or profits accruing or to accrue thereon, or other thing of value whatsoever *as inducement to insurance* or in connection therewith *which is not specified in the policy contract.* [Emphasis supplied.]

Emphasizing the italicized language of the statute, the commissioner found that § 2066(1) was directed at the sellers and purchasers of insurance. The commissioner noted that her interpretation was consistent with Michigan law construing predecessors to § 2066. *Citizens' Life Ins Co v Comm'r of Ins,* 128 Mich 85; 87 NW 126 (1901); *State Life Ins Co v Strong,* 127 Mich 346; 86 NW 825 (1901). OAG, 1941-1942, No 20213, p 179 (May 29, 1941). Other cases not cited by the commissioner also support her construction. *Northern Assurance Co v Meyer,* 194 Mich 371; 160 NW 617 (1916); *Heffron v Daly,* 133 Mich 613; 95 NW 714 (1903). OAG, 1945-1946, No O-3658, p 392 (June 25, 1945). Moreover, the Insurance Bureau interpreted § 2066 as preventing the splitting of a commission with an insured and as preventing rebating (i.e., the insured being repaid part of the charge for the purchase of insurance). We accept the commissioner's interpretation of § 2066(1). In doing so, we specifically note that the language of that section focuses on inducements "not specified in the policy contract" or "not specified in the contract of insurance." Because the contract is executed between the insurer and the insured, it is clear that § 2066 was intended to apply to situations where the insured was induced to purchase insurance because some part of the premium would, in some manner, be returned to him.

Intervenors next claim that the other respondents violated MCL 500.1208; MSA 24.11208, which provides:

> An agent, during any 12-month period, may not effect insurance upon his own property, life or other risk and the property, life or other risk of his employees, employer or business associates, in excess of 15% of the total premium which he effected during that period.

The intervenors claimed that the business referred by respondents' broker-owners was actually the business of respondents and that the brokers' real estate clients were the brokers' business associates. The commissioner found that the other respondents did not write insurance policies for business associates when they insured their owner-shareholder-brokers' real estate clients. We agree with the commissioner's conclusion.

This section prevents an agent from using his license to obtain for himself and entities in which he has a financial interest a preference in the premium rate because he receives benefits (commissions or discounts) on the policies written. See, e.g., *Quetnick v McConnell,* 154 Cal App 2d 112; 315 P2d 718 (1957). We note that the term "business associates" should be read to include the same type of a relationship as between the agent and his employer or employee. *Dickinson Co Memorial Hospital v Northern Professional Emergency Physicians,* 141 Mich App 552, 557; 367 NW2d 833 (1984). We believe that the relationship in this case (assuming the brokers are agents for purposes of this statute), between the brokers and their real estate clients is not the same as the ongoing mutually beneficial economic relationship between an agent and his employees or employers and even himself. We find that the commissioner's

interpretation of § 1208 furthers the purpose of the statute and we affirm her conclusion that none of the brokers' clients were business associates of the brokers and, in turn, respondents.

Intervenors also claim the Insurance Commissioner erred when she held that she had no jurisdiction to consider respondents' alleged violations of RESPA and state antitrust laws in determining whether respondents' licenses should be revoked. MCL 500.1242; MSA 24.11242 provides:

(1) The commissioner shall refuse to grant a license to act as an agent, a solicitor, an insurance counselor or an adjuster to an applicant who fails to meet the requirements of this chapter. Notice of the refusal shall be in writing and shall set forth the basis for the refusal. If the applicant submits a written request within 30 days after mailing of the notice of refusal, the commissioner shall promptly conduct a hearing in which the applicant shall be given an opportunity to show compliance with the requirements of this chapter.

(2) The commissioner, after notice and opportunity for a hearing, *may suspend or revoke the license of an agent,* solicitor, insurance counselor or adjuster who fails to maintain the standards required for initial licensing or *who violates any provision of this act.*

(3) After notice and opportunity for a hearing, the commissioner *may refuse to grant or renew a license to act as an agent,* solicitor, adjuster or insurance counselor *if he determines by a preponderance of the evidence, that it is probable that the business or primary occupation of the applicant will give rise to coercion, indirect rebating of commissions or other practices in the sale of insurance which are prohibited by law.*

(4) Without prior hearing, the commissioner may order summary suspension of a license if he finds that protection of the public requires emergency action and incorporates this finding in his order.

> The suspension shall be effective on the date specified in the order or upon service of a certified copy of the order on the licensee, whichever is later. If requested, the commissioner shall conduct a hearing on the suspension within a reasonable time but not later than 20 days after the effective date of the summary suspension unless the person whose license is suspended requests a later date. At the hearing, the commissioner shall determine if the suspension should be continued or if the suspension should be withdrawn, and, if proper notice is given, may determine if the license should be revoked. The commissioner shall announce his decision within 30 days after conclusion of the hearing. The suspension shall continue until the decision is announced. [Emphasis supplied.]

We agree with respondents' claim that the unambiguous language of § 1243(3) applies to the commissioner's decision to grant or renew a license; in contrast, § 1243(2) applies to the commissioner's decision to suspend or revoke a license. Where statutory language is clear, judicial construction is neither required nor permitted. *Attard v Adamczyk,* 141 Mich App 246, 250; 367 NW2d 75 (1985). This case involved the commissioner's decision to suspend or revoke respondents' licenses; it did not involve the decision to grant or renew respondents' licenses. Consequently, § 1242(3) does not apply to this case. While we note that this was not the commissioner's reason for finding that she did not have jurisdiction to consider RESPA and state antitrust violations, we affirm her decision as reaching the right result for the wrong reason. *Warren v Howlett,* 148 Mich App 417, 426; 383 NW2d 636 (1986). We further note that intervenors do not contest the commissioner's ruling that under § 1242(2) she was only empowered to consider violations of the Insurance Code and not of RESPA

and state antitrust laws in determining whether respondents' licenses should be suspended or revoked.

Finally, intervenors claim that the Insurance Commissioner erred when she concluded that respondents had not violated MCL 500.2012; MSA 24.12012, which provides:

> The following are defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:
> Entering into any agreement to commit, or by any concerted action committing, any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of the business of insurance.

The Insurance Commissioner found that no one applied pressure to the respondents' broker-owners to direct business to Lawyers Title. Instead, the broker-owners (respondents) directed business to Lawyers Title because it was in their financial interest to do so. The commissioner further found that the exclusive agency agreement executed between Lawyers Title and respondents was standard practice in the insurance industry. The commissioner also found that agreements which provide inducements for persons to deal with certain companies do not constitute boycotts as to other companies. *Proctor v State Farm Mutual Automobile Ins Co,* 182 US App DC 264; 561 F2d 262 (1977), vacated and remanded on other grounds 440 US 942; 99 S Ct 1417; 59 L Ed 2d 631 (1979). We hold that the commissioner's findings were supported by competent, material and substantial evidence and, therefore, we affirm them. *Farmers State Bank of Concord, supra.* See also *Baldwin v Escanaba Liquor Dealers' Ass'n,* 165 Mich 98, 110-115; 130 NW 214 (1911), and *Nationwide Mutual*

*Ins Co v Comm'r of Ins,* 129 Mich App 610, 619; 341 NW2d 841 (1983), lv den 419 Mich 895 (1984). We note that the Insurance Commissioner may rid the industry of unfair trade practices not specified in the Insurance Code by proceeding under MCL 500.2043; MSA 24.12043.

Affirmed in part and reversed in part.